## UNITED STATES v. HULER ABATTOIRS, Inc.

### Civ. A. 11375.

United States District Court
E. D. Michigan, S. D.

Dec. 3, 1952.

Donald E. Barris and Joseph H. Jackier, Detroit, Mich., Friedman, Meyers & Keys, Detroit, Mich., for the defendant.

THORNTON, District Judge.

This is a civil action brought by the United States of America to enjoin violations by defendant of a Price Stabilization Regulation issued pursuant to the Defense Production Act of 1950, as amended, Public Law 69, 82nd Congress, 65 Stat. 110; Public Law 96, 82nd Congress, 50 U.S.C.A. Appendix, § 2061 et seq., to recover damages for violations of said Regulation, and to obtain such other, further and different relief as may be just and equitable. Jurisdiction of the suit is vested in this Court by Section 706(b) of the Defense Production Act of 1950, as amended, and also by Section 1345, Title 28 United States Code.

#### Findings of Fact.

1. Defendant, Huler Abattoirs, Inc., a Michigan corporation, was organized under the laws of the State of Michigan, and engaged in the business of slaughtering beef and selling beef products and inedible beef offal at 4079 Deming Street, in the City of Detroit, Wayne County, State of Michigan. Huler Abattoirs, Inc., was incorporated on January 1, 1949, and commenced selling inedible beef offal to Darling & Company on said date.

2. Inedible beef offal consists of the head, the four legs, the intestines, the neck and other inedible portions of cattle. The principal products derived from inedible beef offal are tallow and dry rendering. Tallow is used in the manufacture of soap, and dry rendering is used for animal feed and for fertilizer. Darling & Company is engaged in the process of rendering inedible beef offal so as to obtain tallow and dry rendering therefrom, which products are in turn sold to customers of Darling & Company.

3. From January 1, 1949, until November 1, 1949, Huler Abattoirs, Inc., sold its inedible beef offal to Darling & Company on the basis of a dollar and cents price per set. A set of inedible offal consists of all of the offal derived from one animal.

Philip A. Hart, U. S. Atty., Detroit, Mich., Horace W. Gilmore, Special Asst. U. S. Atty., Detroit, Mich., for the plaintiff.

538

4. On or about November 1, 1949, the method of selling said inedible beef offal to Darling & Company was changed to a formula basis. This formula basis was suggested by Mr. Guy Motter, the then manager and vice-president of Darling & Company. That while the method of selling inedible beef offal to Darling & Company was changed to a formula basis, the term "sets" was continued in the invoicing of the inedible beef offal from Huler Abattoirs, Inc., to Darling & Company.

5. Under the provisions of the General Ceiling Price Regulation, Section 3, the highest price at which defendant delivered inedible beef offal during the General Ceiling Price Regulation base period on December 19, 1950, to January 25, 1951, inclusive, was determined by use of deliveries made January 22 and January 23, 1951. The quantity of inedible beef offal delivered was represented by 171 sets for which defendant charged and received $1385.95, which was equal to $8.11 per set.

6. Under the provisions of the General Ceiling Price Regulation, Section 3, as amended by Amendment 5, effective March 7, 1951, the highest price at which defendant delivered inedible beef offal during the General Ceiling Price Regulation base period of December 19, 1950, to January 25, 1951, inclusive, was determined by use of the deliveries made January 20, 22 and 23, 1951. The quantity of inedible beef offal delivered was represented by 183 sets for which defendant charged and received $1,486.28, which was equal to $8.03 per set, which was the price per set at which, or higher, 10% of the deliveries by dollar volume in the base period were made.

7. Under the provisions of Ceiling Price Regulation 6, as amended by Amendment 2, effective March 12, 1951, Section 15, the highest price at which defendant delivered fat bearing and oil bearing animal waste materials (inedible beef offal) during the Ceiling Price Regulation 6, Amendment 2, base period of November 7 to December 7, 1950, inclusive, was determined by use of deliveries made on December 6 and December 7, 1950. The quantity of animal waste materials (inedible beef offal) delivered was represented by 217 sets for which defendant charged and received $1,312.30, which was equal to $6.05 per set.

8. Under this formula basis, Huler Abattoirs, Inc., and Darling & Company agreed that thenceforth Darling & Company would pay Huler Abattoirs, Inc., for all inedible beef offal sold to Darling & Company on the basis of the average pound yield of tallow derived from each animal, multiplied by the current market price of tallow per pound. In addition, the parties agreed at that time that Darling & Company would pay Huler Abattoirs, Inc., on the basis of the average pound yield of dry rendering derived from each animal, multiplied by the current market price of dry rendering per pound. From the aggregate figure arrived at per animal by using the foregoing formulae, it was agreed that the sum of One Dollar ($1.00) was to be deducted as a handling charge. It was also agreed that from time to time Darling & Company would make tests of the inedible beef offal delivered by Huler Abattoirs, Inc., to Darling & Company, in order to ascertain the average pound yield of tallow per animal and the average pound yield of dry rendering per animal derived from the inedible beef offal sold to Darling & Company, and that adjustments, based upon such tallow yields and dry rendering yields would be made from time to time to reflect any changes in the average pound yield of tallow per animal and in the average pound yield of dry rendering per animal derived from the inedible beef offal sold to Darling & Company. The foregoing formulae, agreements, and provisions for adjustment, were to govern the course of dealings between the parties in connection with the sale of said inedible beef offal from November 1949, and thenceforth.

9. At the time the foregoing agreement was entered into, Mr. Guy W. Motter represented that the average yield of tallow per animal amounted to 30 pounds, and the average yield of dry rendering per animal amounted to 30 pounds. In reliance upon such representation, Huler Abattoirs, Inc., invoiced Darling & Company on the basis of said yields as represented by Mr. Motter until July 31, 1950. On said latter date,

pursuant to previous complaints by Huler Abattoirs, Inc., to the effect that it was not receiving the average pound yield of tallow and the average pound yield of dry rendering, Darling & Company, through Mr. Guy W. Motter, represented to Huler Abattoirs, Inc., that the average yield of tallow was 40 pounds per animal and 25 pounds of dry rendering per animal, and that Huler Abattoirs, Inc., was in fact entitled to an adjustment, and $4,000 was paid to Huler Abattoirs, Inc., based upon said adjustment being retroactive to November, 1949. Pursuant to further complaints by Huler Abattoirs, Inc., on January 6, 1951, Mr. Motter represented that the average pound yield of tallow per animal. was 43 pounds and the average pound yield of dry rendering per animal was 25 pounds. In reliance upon said representations, Huler Abattoirs, Inc., invoiced Darling & Company on the basis of 43 pounds of tallow and 25 pounds of dry rendering, which was the represented yield from each animal, and a retroactive adjustment was made to December 18, 1950, and Mr. Guy W. Motter caused a check to be issued to Huler Abattoirs, Inc. for $2,792.40, making said adjustment retroactive to December 18, 1950. On November 20, 1950, November 27, 1950, and December 15, 1950, respectively, Darling & Company ran a series of tests on the inedible beef offal purchased from Huler Abattoirs, Inc. Mr. Guy W. Motter furnished copies of the tests of November 20, 1950, and November 27, 1950, to Huler Abattoirs, Inc. The test made at Mr. Motter's direction on December 15, 1950, which shows a higher yield than the tests of November 20th and November 27th, was not furnished to Huler Abattoirs, Inc. The tests on November 20, 1950, and November 27, 1950, were not representative tests because they were made on days when a large number of bulls were killed at Huler Abattoirs, Inc., and the bulls produce less tallow than other cattle. Based upon the tests that Guy W. Motter furnished, and upon his representations that the average yield was 45 pounds of tallow and 28 pounds of dry rendering, an adjustment was made on January 22, 1951, which adjustment was retroactive to December 1, 1950. Mr. Guy W. Motter caused a check to be issued for $1207.89 to cover this adjustment in weight.

10. All of the foregoing adjustments were made in accordance with the original agreement of the parties as above set forth, and were accepted by Huler Abattoirs, Inc., in reliance upon the fact that the representations made by Mr. Guy W. Motter as to the average yields were true and representative of the average pound yields derived from the inedible beef offal being sold to Darling & Company.

11. The representations made by Mr. Guy W. Motter to Huler Abattoirs, Inc., as to the tallow and dry rendering yields were in fact false.

12. All of the foregoing adjustments were made before any ceiling price regulations were promulgated by the Office of Price Stabilization, and said adjustments were made in accordance with the agreement previously made by the parties as above set forth.

13. On or about February 10, 1951, Mr. Guy W. Motter resigned from Darling & Company without previous notice, and took with him several key employees, and went into a rendering business in competition with Darling & Company. Shortly after Mr. Motter's resignation from Darling & Company, Mr. Arthur R. Bethke became the manager of the Detroit office of Darling & Company. Pursuant to complaints by Huler Abattoirs, Inc., Mr. Bethke made an investigation of the formulae and the agreement existing between Darling & Company and Huler Abattoirs, Inc., and found that Huler Abattoirs, Inc., had not received payment for the average pound yield of tallow and the average pound yield of dry rendering per animal during Mr. Motter's administration of the affairs of Darling & Company. Thereupon, at Mr. Bethke's direction, several yield tests were made, and weight sheets showing the actual weights of inedible beef offal purchased from Huler Abattoirs, Inc., from February 4, 1951, through March 11, 1951, were furnished to Huler Abattoirs, Inc., by Mr. Bethke. Said weight sheets showed that the average weight of the inedible beef offal was 169 pounds per animal.

Based upon these weight sheets and the percentage yield as shown in the tests of November 20, 1950, and November 27, 1950, Huler ·Abattoirs, Inc., prepared a claim against Darling & ·Company based upon an average yield of 59 pounds of tallow and 37 pounds of dry rendering per animal. Said claim covered the period from November 28, 1949, through February 23, 1951, and amounted to $56,782.-49. Said claim was prepared on the grounds that Huler Abattoirs, Inc., had not been receiving the average pound yield of tallow and the average pound yield of dry rendering per animal during Mr. Motter's administration. Numerous conferences took place between the parties in regard to said claim, and a good faith compromise was entered into whereby Darling & Company paid Huler Abattoirs, Inc., the sum of $20,000, which sum represented a compromise adjustment to reflect ·the average yield of tallow per animal and the average yield of dry rendering per animal that Huler Abattoirs, Inc., was entitled to receive during the period from November 28, 1949, through February 23, 1951. In making the settlement, Darling & Company, through Mr. Bethke, admitted that Huler Abattoirs, Inc., had not been paid in accordance with the original agreed formulae. This adjustment was made in accordance with the original agreement of the parties, and without any intention to evade or circumvent any price regulations promulgated by the Office of Price Stabilization.

14. The adjustment of $20,000 was in fact a bona fide yield adjustment and not a price adjustment. Subsequent tests and investigation by Mr. Arthur Bethke revealed that the pound yield of tallow per animal was in excess of 53 pounds and the yield of dry rendering per animal was in excess of 32 pounds, and based upon his findings, a retroactive adjustment was made on August 11, 1951, effective April 2, 1951, and $4,798.65 was paid to Huler Abattoirs, Inc. This sum represented the adjustment that Huler Abattoirs, Inc., was entitled to receive based upon the yield of 53 pounds of tallow per animal instead of 50 pounds of tallow per animal, and based upon 32 pounds of dry rendering per animal instead of 30 pounds of dry rendering per animal for inedible beef offal delivered during the period from April 2, 1951, to August 4, 1951. This yield adjustment was a bona fide adjustment and was made in accordance with the original agreement of the parties, and was entered into without any intention to violate any ceiling price regulations.

That the representative of the Office of Price Stabilization, upon the advice of his agency's Legal Department, did not consider the adjustments as being retroactive to the base periods in arriving at the ceiling prices.

## Conclusions of Law.

■ 1. The Defense Production Act of 1950 and the Act as amended, is valid and constitutional. ·

■ 2. The General Ceiling Price Regulation is valid and constitutional.

. 3: Amendment 5 to the General Ceiling Price Regulation is valid and constitutional.

4. Ceiling Price Regulation 6 is valid and constitutional. ·

5. Amendments 2 and 9 to Ceiling Price Regulation 6 are valid and constitutional.

6. The sales by defendant of inedible beef offal beginning January 26, 1951, and continuing through March 6, 1951, were governed by the General Ceiling Price Regulation.

7. The sales by defendant of inedible beef offal beginning March 7, 1951, and continuing through March 11, 1951, were governed by the General Ceiling Price Regulation, Amendment 5.

8. The sales by defendant of fat bearing and oil bearing animal waste materials (inedible beef offal) from March 12, 1951, through July 5, 1951, were governed by Ceiling Price Regulation 6, as amended by Amendments 2 and 9.

■ 9. The United States of America is the proper party plaintiff to this action.

10. That there was a legal obligation upon Darling & Company to pay to Huler Abattoirs, Inc., a price in accordance with the true average pound yield of tallow per animal, and the true average pound yield

---

of dry rendering per animal derived from the inedible beef offal sold to Darling & Company by Huler Abattoirs, Inc., and that this obligation was in existence at the time of the base periods set forth in the above complaint.

11. That the amount of the adjustments paid to Huler Abattoirs, Inc., by Darling & Company was arrived at in accordance with established and fixed formulae, and that there was no change in these formulae after the expiration of any of the base periods which would yield a selling price higher than that established under the formulae applicable during any of the base periods.

12. Defendant Huler Abattoirs, Inc., was entitled to price the inedible beef offal sold to Darling & Company on the basis of the formulae entered into between the parties on or about November 1, 1949. Under these formulae, the pricing method adopted by the parties was based upon the average pound yield of tallow and the average pound yield of dry rendering derived from the inedible beef offal sold to Darling & Company during the period involved in this complaint.

13. The per pound price of tallow and of dry rendering charged by Huler Abattoirs, Inc., during the period involved in the complaint was in accordance with the ceiling price regulations. There is nothing in the regulations which required Huler Abattoirs, Inc., to change its method of doing business established long before the ceiling price regulations went into effect.

14. The adjustments made between the parties in this case were yield adjustments, and not adjustments in price, and they were made in good faith to compensate Huler Abattoirs, Inc., for previously false yields furnished to Huler Abattoirs, Inc., by Darling & Company.

15. Neither the yield adjustments nor the prices charged by Huler Abattoirs, Inc., constitute a violation of any ceiling price regulations promulgated by the Office of Price Stabilization.

16. The price regulations involved in this case were not designed to prevent Huler Abattoirs, Inc., from receiving the correct average yield that it was entitled to receive under its original agreement with Darling & Company.

17. There was no violation of price ceiling regulations involved in this case, and the complaint therefore is dismissed.